Good afternoon. My name is Alan Vaught. I'm the attorney for the appellants in this lawsuit. This particular case represents three cases that were on appeal that addressed the Warren Act and generally addressed drilling rig workers, roughnecks. This case was held in abeyance pending the ruling in a case named Meadows v. Latchaw Drilling, which came out adversely to my side. However, after that case came out, the second of the third cases, Walker v. Trinidad, as the court may note from the docket, I believe that one was held in abeyance as well, we dismissed that case because it had fact patterns very similar to the Latchaw Drilling case. However, we did not dismiss this one because we believe it is very different in its fact pattern, the evidence before the district court when it granted summary judgment, and other matters addressed in our briefs from the Latchaw Drilling opinion. Really the core issues before the court are, number one, was it appropriate, especially in light of this court's decision in Hindshorn v. Carabannon Shaw on deciding summary judgment when there's competing declarations, competing affidavits, and very importantly, competing deposition testimony that raised fact issues that should go to the jury. We believe that under that Hindshorn standard, the district court respectfully committed error when it entered summary judgment on one of the causes of action asserted by plaintiffs in this case, and we believe that the court, district court committed error when it ruled on the other three causes of action which were not made a basis of the appellee's underlying motion for summary judgment. Essentially, these were matters raised for the first time on reply. We requested more time under Rule 56F2 to brief these matters. Those were denied, and the court granted summary judgment on all theories of recovery, even though only one was pleaded in the motion for summary judgment. The second matter, assuming arguendo, that appellants do not prevail in getting a reversal is the matter of cost. In this case, it's the WARN Act, the Worker Adjustment Retraining and Notification Act. As Judge Southwick joined an opinion in the native, the Ulibis v. Native Woolfield case, which was an F. Alosa case, that statute is a remedial statute that should be narrowly construed against the employer. This is also a remedial statute, the WARN Act, which should be narrowly construed against the employer. We cited several cases where it's inappropriate in a remedial statute like this for a court to award cost, absent a showing of the case being frivolous, etc. So, with regards to the four causes of action that were before the court as set forth in plaintiff's well-made pleadings, there was no motion to dismiss made in this case, so there was no dispute as to the adequacy of the pleadings. The first cause of action was the key issue when it comes to the WARN Act determination here, single side of employment. We submitted that pursuant to 20 CFR 639.3 I-3, that there was evidence before the court as to reasonable geographic proximity of drilling rigs operating in operational areas. Well, isn't your principal argument on that is a management supervisory connection between the two? You do have some evidence of a statement that you could see one rig from another, but basically your argument, I thought explicitly, was to rely on the management connection of the rigs. Well, sir, no, that is one part of it. I guess it's important to back up and explain this operational structure and one of the key distinctions in this case from the Latshaw case. That's important for you to do. Yes, sir, and I'll do that right now. Patterson Drilling has eight operational areas, and in each operational area, and seven of those were made a part of this case, in each of those operational areas they have a regional yard. For example, the Midland Yard, the Tyler Yard, the Fruita, Colorado Yard. All the employee earning statements for rigs operating within those operational areas, the employee earning statements will say, for example, rig employee Fruita, Colorado, employee Tyler, Texas. All payroll for those employees and a regional office. Now, each regional office will have one or more drilling superintendents that, based upon the undisputed testimony, manage about five drilling rigs. So the issue we have here is very distinct from the issue in Latshaw where they only had one office in Tulsa, Oklahoma, but were operating in multiple states. There were no regional yards. Payroll wasn't coordinated through operational offices. Hiring and firing wasn't made in the operational offices here. They were. In fact, when the employees were let go, it listed at the top of their firing, their pink slip, that they were a rig employee Tyler, for example, as opposed to just some general employee of Patterson Drilling. So in this case, we were able to present, at the summary judgment level, contradictory evidence to the motion filed by the appellant that each employee in each operational area, which we sought to make its own class, they shared employees and equipment amongst the drilling rigs in those operational areas. Those drilling rigs had the same purpose. They drilled wells for customers or defendant in those operational areas. And with regards to the point you were addressing, Judge Southwick, on reasonable geographic proximity, there was testimony from several plaintiffs that they could visibly see other drilling rigs operating from where they were working. Is it accurate that there was not any specificity to that? It seems to be part of what is being argued by your opposing counsel is that maybe there were two rigs or one situation in which that was the case, but even that one wasn't clearly identified as to location and the frequency and the locations of this just are not part of the record? Well, Your Honor, we, our clients, for example, with regards to the specific testimony on being able to see the rigs, we know exactly which rigs those plaintiffs worked on and in pages 14 to 15 of our brief, we identify by name plaintiff, each one is a purported class rep for an operational area, the rigs upon which they worked and when they worked there. And furthermore, that evidence is shown in something called the IEDC reports, International Association of Drilling Contractor Reports, which were put into evidence. But moving aside from that reasonable geographic proximity, which was really something the district court focused on and it was the focus of the Latshaw case, we had other pleaded causes of action, the outstation employee, which does not have a geographic proximity test. It just states that a single site of employment is the place where the assigned home base is, which there's facts here, which a jury could look at to determine, well, Patterson says these workers are rig employees, Victoria, Texas, on their earnings statements, their payroll comes through there, their management comes through there. That is their single site of employment. It also allows for a single site to be a place from which the work is assigned and it's undisputed that the drilling superintendents who managed up to five drilling rigs and consequently up to around 20 some odd employees each on each rig, there's evidence that the jury could use to determine that that would be the single site of employment. And then there's also the factor under outstation employee for where they report. And you don't have to have all of them, just one. One of the three. Finally, we argued plant closing. Again, not made a part of the appellant's motion for summary judgment. Plant closing is unique from mass layoff. Mass layoff requires 50 employees at a single site of employment. It equals at least one-third of the employees at that single site of employment to lose their job within a certain time period. Plant closing just requires 50 employees to lose their job. There's no percentage test. It's an important distinction. There's also no geographic regional test. And in fact, one of the things that appellant claims in this case, they claim that each of their drilling rigs is an individual profit center. That cuts against them. That's evidence in our favor when it comes to plant closing. Because if you look down at 20 CFR 639.3J, it talks about operational units within a plant or across a single site of employment. So that is yet another cause of action that we have evidence of in the record that we could submit to the jury. Another reason we believe the court erroneously granted summary judgment. And then finally, we argued the truly unusual organizational situation under 639.3I8. The court, as noted in Davis v. Signal Intern, stated there's a dearth of case law on that. And indeed, truth be known, when it comes to a single site of employment under Warren Act, there's a dearth of case law on it in general in the Fifth Circuit. This is not a common law that comes up or gets argued. So, with regards to the grant of summary judgment, we believe that there was competing fact evidence that under the Heinsohn standard should have gone to the jury. And again, it wasn't just happy camper declarations. It was deposition testimony of 30B6 witnesses of Latchaw Drilling we submitted in our support. Some of their drilling superintendents we submitted in our support that support these arguments we've made on management being through the rig yard. They even testified that in the rare instance that a drilling rig left an operational area like rig yard in Midland and went to work in the Victoria area, or the area covered by the Victoria regional office, that the chain of supply management still flowed from Midland. It didn't transfer to Victoria. So, that helps us really isolate these operational areas to focus on them as a single site of employment. We also believe that the court respectfully committed error by granting summary judgment on causes of action we pleaded that were not raised in the underlying motion for summary judgment. We objected to that at the hearing. We believe we should have been afforded a better opportunity to brief it and address it. And then finally, with regards to the matter of cost, the court did award costs in this case. We timely objected to that. And we cited case law from other districts. There's no case law in the Fifth Circuit and none in district courts that I'm aware of within the Fifth Circuit addressing Warnock cases where the plaintiff loses and states that unless the employer, the appellee here, can demonstrate that the plaintiff acted frivolously, unreasonably, or with a lack of foundation, the cost should not be granted. Of course, there's the case law within our circuit that talks about an award of cost. Should be denied where there's good faith and there's a close legal issue. With regards to the other matters under the Warnock Act, there's no dispute that these layoffs happen, that the numbers are there. We had a good faith basis for bringing this claim, our clients lost their jobs. To now impose costs upon them, I believe, would be adding insult to injury. But they had a good faith basis for believing this. And as the Fifth Circuit has noted on the absence of case law, there's close legal issues here, legal issues that have not been decided before. And this one being on the other spectrum from the Latchaw case, we believe still supports our basis for good faith and that this is a close issue. It seems to me you do have some other theories and you have this issue of how much should have been resolved on summary judgment. But if you just look at Meadows-Latchaw, it seems to me a lot of your case falls closely under it. And it seems to me that was part of the concern and why costs maybe were properly awarded. Are you disputing that on a single side of employment, that that wasn't largely decided under Meadows? Yes, sir, I am. Because single side of employment, the case law is clear. What's reasonable geographic proximity? And again, we were dealing with that one prong of the single side of employment factors under the Warren Act. Case law says it's determined on a case by case basis, a factual inquiry. But if you use the precedents that are there, you're not starting afresh every time, even if you're deciding a case by case. We don't need to clog this, but it does seem to me Meadows is useful on at least some of this case. Yes, sir. My time is up. May it please the Court, I'm Catherine Flanagan and I'm representing the defendant appellee, Patterson UTI Drilling Company. And let me, I'd like to start where appellants left off, talking about specifically those theories that plaintiff's appellants claim that were not addressed and were not right for the court to address on summary judgment. And that goes to the heart of the plaintiff's appellant's argument that the summary judgment was in part improper because it was sua sponte. Interestingly, this court, in the Latshaw decision from August of this year, specifically addressed one part of that, which was whether the plant closing issue had been raised by Latshaw in that case. And specifically found that in that case, in the summary judgment briefing, Latshaw had cited the two criteria, both for plant closing and mass layoff, cited the text of sections 2101A2, which is plant closing. And 2101A3, which defined mass layoff. And the court, this court, went on to say that the argument then that Latshaw made was that because single site was the rig, then the plaintiffs in that case failed to meet the standard for either plant closing or mass layoff. And that that issue, in fact, had been addressed and properly ruled on by the court on summary judgment. And, Your Honors, we have the same situation here. All of those theories or claims, however you want to categorize them, some of them, frankly, are just definitions under the regulations. But all of those theories and claims that the plaintiffs claimed were raised specifically in the motion for summary judgment. Not just in the reply, but in the motion for summary judgment. In this case, the plant closing criteria was quoted extensively at pages 1480 to 1481 of the record, and that's in the motion for summary judgment. And the defendant, Appelli, argued specifically that because the single site was the rig, that neither criteria for plant closing or mass layoff was met, because the rig, it's undisputed, had fewer than 50 employees. That was addressed there. Also, Your Honor, contrary to what the Appellis have argued here, in addition, both outstation employees was addressed. In fact, four pages of defendant's motion for summary judgment was devoted to a discussion of outpatient, or excuse me, outstationed employees. And that, we have the site for the record in our briefing. I believe that starts at 1496 of the record, four pages. The interesting thing about that theory is that plaintiffs failed to respond at all to that. It is not in their response brief. It was not addressed at all at the motion for summary judgment hearing. And under the rules, the local rules, as well as the federal rules of procedure, that theory was actually unopposed. And the court, on that basis alone, was proper to grant summary judgment. And really, at this point, the Appellis have waived that argument as well. Let me make sure I understand what you think are different theories here, because I do see the different sub parts of 639.3 have been referenced. It seems to me that single site is going to be the same under the Warren Act for almost any of this. You have mass layoffs and you have plant closings, but we only have one of those here. And what do you see as different theories that have been alleged here that are, in fact, different theories? Let me go in the negative first. The plant closing theory, or the plant closing argument, actually encompasses this idea of... Operational unit, because an operational unit within plant closing has to be part of a single site. So literally, the definition of plant closing is that there was a shutdown at a single site of employment, or an operational unit within the single site of employment. So that's not a different theory. That's all part of what a plant closing is. Then the idea is, so what is a single site? And that's truly, as Appellis counsel said, that is the key issue. Because if there was not a layoff that affected an employment loss of 50 or more employees at a single site, then all of these arguments fail. And that's where, when the court in this case found, the district court found, that the single site was the rig. It's undisputed, as I said, that it's impossible that 50 employees could have been laid off from that single site of employment. And therefore, the plaintiff can't meet either the plant closing or mass layoff that triggers Warren. The alternative theories, if you want to call them that, are possible alternative theories of what a single site could be. So for example, truly unusual organization, which by the way is also addressed, or was addressed at page 32 of the defendant's motion for summary judgment. Truly unusual organization is another way to get at what is a single site. That theory actually was specifically rejected by both the courts in Trinidad Drilling, which is out of the Western District, and the Eastern District from Louisiana decision of access drilling. So that's been rejected in cases that are amazingly similar. These are all drilling rig cases. As we've briefed, every case that has looked at what is a single site for a drilling employee who works on a drilling rig, or drilling rig, really a rig employee who works on a drilling rig, every case has held that the rig itself is the single site. Going back to the issue of reasonable geographic proximity. So what's happened in this case, and really again going back to the key issue of what is the single site. The general rule that has been followed by every district court, and now this court, looking at, in this context of a drilling rig, what is a single site. The general rule is that separate facilities are each a separate single site. Then there are exceptions to that general rule. One is the exception if there are three criteria met. One is the separate facilities have to be in reasonable geographic proximity, and they have to, and it's three part by the way, the plaintiff appellees have to meet all three criteria to meet this definition of single site. If there's reasonable geographic proximity, also these separate facilities have to share employees and equipment. And thirdly, they have to share a common operational purpose. In this case, just as in Latshaw, and just as in all the other cases where these courts have looked at rigs among their single site, in this case there was no specific location identified, no evidence. And in fact, Judge Ellison specifically asked during the summary judgment hearing of the plaintiffs at that time, where is the evidence of the location of the rigs that they were trying to aggregate to the rigs of the appellants? And the answer repeatedly, properly was, there is no such evidence here in the record. There was no evidence. And that is exactly what the court, this court, in its decision in Latshaw, in Meadows v. Latshaw, found, that where the only evidence in the record is unspecified locations of unspecified distances from each other, you cannot meet the reasonable geographic proximity test. One of the things the counsel responded to a little while, a few minutes ago, is at least one of the pieces of testimony came from somebody who could be identified as a single site. And that person could be identified as to where that person worked. Why doesn't that get him further than you're saying? And, Your Honor, that is actually exactly what was discussed at the hearing in the summary judgment motion, the transcripts in the record. There were locations of the rigs where the particular appellants or the plaintiffs worked. But there was no evidence of what the locations were of the other rigs that plaintiffs were claiming should be aggregated to each appellant's rig. So you had testimony from somebody who you could locate at a particular rig, who says, I could see an adjacent rig, but you didn't know the exact distance? You didn't know what rig the person allegedly was seeing? Is that part of the fault? Correct. So that was the kind of generalized testimony that there was. There was generalized testimony, such as one witness saying that they could see rigs. Of course, these rigs are 160 to 180 feet tall in places like Midland, and so you could argue about whether that's evidence of anything in terms of distance, because they could probably see those rigs from pretty far away. But regardless, that's very generalized testimony. In addition, there was testimony that a superintendent could drive from one rig to another in a day. Again, what that means, that's not the kind of specific testimony. But all these other courts that have found reasonable geographic proximity, and that's really what this court found in Latshaw, too. All those other cases where there's been reasonable geographic proximity found have involved very specific, either evidence of locations that were 50 miles apart or two miles apart, very specific proximity. There is no evidence here of that nature. Well, is it some evidence that you could drive to the different locations? One supervisor has all of those. Why isn't that some evidence? It would seem like it's on the verge of some evidence, if it's not, that you just take his deposition and you say, which people do you drive to every day, what's on your route, and how many people work on those rigs? Well, Your Honor, it lacked a type of specificity, and that's really, the issue is that it was insufficient evidence as a matter of law, and that's where the court found. But you think that, I mean, so this case is capable of being made out, then maybe. Not on this record. But, yeah, so with more testimony from the supervisor, if that really is one unit. If there was evidence of the specifics, maybe, it would depend on what those specific locations were and what those specific distances were. But that just wasn't the evidence in this case. There wasn't any specific evidence of what the actual distances were to show reasonable geographic proximity. And also, Your Honor, this case fails because plaintiffs couldn't meet the other two criteria either, which was the sufficient sharing of employees and equipment, or the same operational purpose. And again, the courts that have looked at this for drilling rigs, and specifically the Trinidad drilling and the Axis drilling case, have both found that the fact that there may be a superintendent who has oversight over a certain number of employees, that is not sufficient to show a common operational purpose. And there's also authority that it's not sufficient that all the rigs might have been drilling, had the common goal of drilling for oil and gas. A common production doesn't make a common operational purpose. And here, there was testimony and evidence that these rigs are incredibly independent. You've got an entire hierarchy on the rig. You've got a rig manager who manages that rig on a daily basis, working with a particular customer that they're drilling for at that particular well site. How they drill, when they drill, whether they're doing horizontal or vertical drilling, what the geology is, what the engineering is, what the mud program is. All those specifics that go into what a drilling rig does are very unique to that particular drilling rig drilling that hole for that particular customer under a particular contract. In fact, it's so specific that the customer has a company man representative, is what they call them, company men. A representative who's on the job site, who's working directly with the driller and the rig manager on what really helps them to get the rig right. Helping decide what's going on with that drilling rig at any given point in time. That rig manager, that driller, has authority to be able to discipline employees. In fact, there was evidence that certain employees did get disciplined from the rig manager and the driller. That all shows how independent those rigs are operating. And the rig manager was responsible for the financial performance of that rig based on the particular contract terms that they were operating under. And I do want to address also the issue of, I believe I finished addressing the issue of whether the court improperly sui sponte granted summary judgment. But just to reiterate, all of the claims and theories that the appellants are alleging were not included in appellant summary judgment briefing were, in fact, included. And were fully argued at the motion, the summary judgment motion hearing that plaintiff appellants had notice of. In fact, the motion for summary judgment was on file in March. And the hearing wasn't until August. So plaintiff's appellants had plenty of opportunity if they felt that there was anything else they needed, additional discovery, a stay of the court's ruling. They had plenty of opportunity to make that kind of motion to the court. And they did not under Rule 56. Well, I haven't looked at your actual motion. When I do, well, I find that it seems to be some acceptance here that challenged one particular or less than all of the theories. What is it in your motion that makes it arguable that it's not an across-the-board summary judgment on all the issues raised by the complaint? Your Honor, I don't know. I really don't. I mean, frankly, it's baffling to me. We fully argued all aspects of plant closing. And we've got sites in the record to how many times we used the term plant closing. There were four pages that talked about outstation. One page that talks about truly unusual. I don't understand at all, frankly, Your Honor. And in fact, even in the summary judgment hearing, Judge Ellison specifically asked about the factors for truly unusual, asked about the Davis case. And that was addressed by the court. Interestingly, I know appellants have stated that geographic proximity is not a requirement for some of the theories that they want to pursue. Interestingly, this court in the Davis case specifically said, even in the truly unusual organization situation, geographic proximity is important. And cited to the fact that in that case, the two facilities that were going to be aggregated into a single site, were only one mile apart. So geographic proximity is important. And finally, I just want to address the issue of the costs and the authority that appellants have relied on on costs, or either authority under Rule 11 or authority under the fee shifting provision of the Warren Act itself. None of that authority says that because Warren has its own fee shifting provision, that precludes an award of costs under Rule 54. And we moved for costs under Rule 54. And in fact, Judge Ellison was very careful and thoughtful. He did not abuse his discretion, which is the standard this court would have to apply. He did not abuse his discretion. He was very thoughtful and careful in looking at all the costs that were requested, and in fact didn't grant, didn't award all the costs that the defendant had sought, and decided specifically which costs to award. And the appellants have also argued that they acted in good faith in filing this case, and as a result, they should not have an award of costs entered against them. But this court has said that that is not the standard for denying costs, whether the action was filed in good faith. Court costs were properly awarded under Rule 54. Is there anything else the court would like me to address at this time? And for all those reasons, and obviously for all the reasons that we've briefed in this case, we would respectfully ask that the court affirm Judge Ellison's grant of summary judgment in this case. Thank you. I believe the first point I'd like to make goes back to the distinction between this case and the Latshaw drilling case. There was a lot more evidence in the record on this case. There was also evidence we submitted in our brief on our alternative theories of recovery, which we didn't do in the Latshaw case, presenting those specific sites that could support matters that we believe the move-in had not moved for in their summary judgment motion. The other critical factor here that distinguishes this from Latshaw is that Latshaw had one yard in Tulsa, and I think it was like 40 rigs that operated in Texas, Arkansas, Louisiana, New Mexico, and probably some states I'm forgetting. That was a harder pattern to tie together on single side of employment. The Operational Yard, the Midland Yard, the Victoria Yard, the Fruit to Colorado Yard, those rigs all stayed in that operational area. Those rigs shared employees and equipment operating in that operational area. For example, in Midland, it would be the Permian Basin. And splitting hairs, I think, a little bit was the argument on drilling rigs do different things. No, they drill holes in the ground. I think that splitting hairs more than the WARN Act requires to say, well, one well is a slant well, the other one is a vertical well. What about that they have different clients, customers? Well, if that were the case, there could never be a WARN Act, because every business in the country has different customers. No, but they're the company people that direct the actions of that. Well, I don't think that's the evidence in the record, Your Honor, and to the extent that appellant has any evidence on that, there's competing evidence. Because here, the testimony from the named plaintiffs and even the testimony from some of the witnesses for the appellant was that the decisions on what to do, when to do, how to do it, and where to do it were conveyed to my clients by Patterson Drilling, not by some customer, an oil and energy company. With regards to, and again, this is just one of the single side of employment examples, the one that talks about reasonable geographic proximity, sharing employees and equipment, and same operational purpose. We actually gave the court with direct testimony on the distance from the rigs. And again, drilling rigs drill for a few weeks at a time. They don't have mailing addresses. I can't give you a postal address for a drilling rig. They operate out of the Midland Yard. When they're stacked, they get stacked in the Midland Yard. But they go out and they drill, in the Midland example, in the Permian Basin. We had a plaintiff, Mr. Hanks, testify that all of the rigs were pretty much within seeing distance of each other. That's in the record. He further testified that we were all drilling in the same area within a 3 to 10 mile radius. The court has that evidence. And that's something that supports us in getting our day in court before a jury that competes with the appellant's for predicting evidence. Furthermore, there's testimony from the plaintiffs, not declaration testimony, but deposition testimony, that the rigs operated so close to each other that they could drive from their rig to another drilling rig to get parts and equipment and bring back to the rig so they could keep going. Because these rigs have to operate 24 hours a day, generally 7 days a week. And if they don't have the parts and equipment, they shut down. And it has a lot of implications in the oil and gas business that are negative. With regards to the plant closing, I respectfully disagree with counsel on what the definition of operating unit is. And again, that's at 20 CFR 639.3 subsection I. And it says, term operating unit refers to an organizationally or operational distinct product, operation, or specific work function within or across a single site. And again, we're arguing that these rig yards, the headquarters, the operational areas are that single site. And taking defendant's argument that each one is its own profit center, then that plays into supporting our argument that each one is an operating unit across that single site. And I'm out of time. And if there are no questions, we respectfully ask that the judgment be reversed and the cost be reversed. Thank you, counsel. We have an argument. This case is also submitted and we will stand in recess until tomorrow.